IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JOSE GUADALUPE CAMACHO,<br><br>Defendants. | ORDER<br><br>Case No.  1:07CR103DAK |

This matter is before the court on Defendant Jose Guadalupe Camacho's Motion to Suppress Evidence.  The court held an evidentiary hearing on the motion to suppress on January 8, 2008, and closing arguments on February 8, 2008.  At the hearings, Defendant appeared and was represented by Joseph Jardine, and Plaintiff was represented by Branden Miles.  The court carefully considered the memoranda and other materials submitted by the parties.  Since taking the matters under advisement, the court has further considered the law and facts relating to these motions.  Now being fully advised, the court renders the following Order.

**FINDINGS OF FACT**

On August 12, 2007, Utah Highway Patrol Trooper Andrew Davenport was in his patrol vehicle in the vicinity of 2800 Street and Adams Avenue in Ogden, Utah, patrolling for DUI and other traffic violations, when he observed a Cadillac Escalade make a left turn without using a turn signal.  Davenport noted that he also could not see a registration on the vehicle so he closed

the distance on the Escalade and turned on his overhead lights to initiate a traffic stop. When Davenport was within ten feet of the Escalade he could see the temporary registration.

Instead of immediately pulling over and stopping at the side of the street, the Escalade moved to the right and continued moving at a slow pace for over three hundred feet. Davenport followed the vehicle as it slowly made a right turn to go behind a building, down a narrow alley for one hundred twenty-five feet, and into an apartment complex parking lot. The parking lot was not well lit and it was in an area not visible from the street. The location made it difficult for Davenport's fellow officers to find his location and provide back-up support. In fact, Davenport testified that he felt as if he was being "lured" to the area for that specific reason.

Davenport radioed for back-up officers to respond and proceeded to stop his car forty-five feet behind Defendant's Escalade. Davenport got out of his patrol car and approached Defendant's Escalade. But Davenport stopped at the rear bumper. From this position he could not see into the interior of the vehicle due to the very dark window tinting. Davenport was able to see Defendant's face in his side, rear-view mirror, but he could not tell whether there were other people in the vehicle.

For officer safety reasons, Davenport commanded Defendant to roll down the rear passenger window on the driver's side so Davenport could determine whether there were other occupants in the vehicle. Defendant rolled the window down a few inches, which was just enough for the officer to see that Defendant was the only occupant of the vehicle. Davenport testified that he chose to have Defendant remain in the vehicle because he would have greater control of the suspect and limit his movement to access weapons. Having Defendant roll his

window down so that the officer could see who else was possibly in the vehicle was the only way to approach the vehicle without exposing Davenport to unnecessary risk.

Davenport approached Defendant and asked for his license and information. Defendant provided him with a Utah drivers license identifying him as Jose Camacho. At this point, Davenport glanced into the rear of the vehicle through the open window to ensure that Defendant did not have access to weapons. When he did this, Davenport observed the grip of a handgun sticking out from under the passenger seat on the floor. Upon seeing this, Davenport pulled his weapon and ordered Defendant to put his hands up. Davenport retreated to the rear of the vehicle and radioed for his back-up officers to expedite their arrival.

Davenport's back-up arrived shortly thereafter. When the other officers arrived, they ordered Defendant out of the Escalade and onto the ground. The officers placed Defendant into handcuffs and placed him under arrest. The officers performed a protective search of Defendant and discovered a handgun holster. The officers also did a protective sweep of the vehicle for other weapons and removed the handgun.

Defendant did not notify the officers about the presence of the weapon or whether he had a concealed weapons permit. Davenport testified that this is in stark contrast with the vast majority of legal concealed firearms permit holders, who almost immediately inform him of the presence of a weapon in the vehicle. After the situation was under control, Davenport ran Defendant's information through his computer and determined that Defendant did not have a concealed weapons permit.

In searching the vehicle, the officers seized a protective bullet-proof vest, a glass pipe

with residue, several rounds of ammunition for different caliber weapons, rolling papers, and 2.35 ounces of methamphetamine. The Escalade was impounded after the search. Davenport asked the gang unit to respond based on what had been found in the Escalade and because Camacho was wearing a red shirt and red baseball cap, which he believed to be indicative of his association with a gang.

Davenport also testified that he observed signs indicating that Defendant had used drugs recently. Specifically, Davenport observed that Defendant had cracked and dry lips, a blistered tongue, and constricted pupils even though it was dark outside. He told Defendant he was under arrest and transported Defendant to the highway patrol office to conduct a DUI Metabolite investigation. Defendant was not administered any field sobriety tests. As part of this process, he asked Defendant to submit to a urine test which later confirmed the presence of amphetamine and methamphetamine.

Davenport read Defendant his *Miranda* warnings. Defendant indicated that he understood the warnings and agreed to answer questions. Defendant admitted to Davenport that he purchased the handgun from an advertisement in the *Standard Examiner* for $450. He also admitted to purchasing the large quantity of methamphetamine for $700-800, though he had not actually paid for it yet. Defendant admitted that he was a meth buyer and user. Defendant stated that he had last used meth two days before and that he had previously been in drug therapy.

## CONCLUSIONS OF LAW

The legality of a traffic stop is to be examined under the two-prong test announced in *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968). *United States v. Williams*, 403 F.3d 1203, 1206 (10th

Cir. 2005). First, the stop must be "justified at its inception." *Id.* Second, the officer's conduct during detention must be "reasonably related in scope to the circumstances which justified the initial stop." *Id.* The touchstone of the Fourth Amendment is reasonableness. *Florida v. Jimeno*, 500 U.S. 248, 250 (1991).

The stop in this case was justified at its inception because Davenport witnessed Defendant violate a traffic law. *See United States v. Botero-Ospina*, 71 F.3d 783 (10th Cir. 1995). "[T]he decision to stop a vehicle is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996).

Because the stop was justified at its inception, the court must analyze whether the scope of the detention was reasonably related to the circumstances that justified the interference in the first place. In *United States v. Mendez*, 118 F.3d 1426 (10th Cir. 1997), the Tenth Circuit stated that an officer conducting a routine traffic stop ,ay investigate whether the driver has a valid license, valid registration, valid insurance, has warrants, or is in lawful possession of the vehicle. *Id.* at 1429. The officer may detain the driver and the vehicle as long as reasonably necessary to make those determinations or to issue a citation or warning. *Id.*

Despite the need to make the stop last no longer than is necessary, an officer does not have to conduct the stop in a manner that unnecessarily puts his safety at risk. *Terry*, 392 U.S. at 23. In *United States v. Holt*, 264 F.3d 1215 (10th Cir. 2001), the court recognized that all traffic stops involve inherent danger to the officer and an officer's interest in safety may require the motorist to perform reasonable actions to enhance the officer's safety. *Id.* at 1222-23. The court approvingly cited cases where officers have ordered the driver out of a vehicle, opened the door

5

of a vehicle with darkly tinted windows to check for weapons, and used a flashlight to illuminate the interior of the vehicle. *Id.*

The circumstances of the stop in this case created a reasonable suspicion of danger to Officer Davenport's safety. The unusual length of time Defendant took to pull over and the way in which he exited the public streets undoubtedly caused significant concern. In addition, the heavily tinted windows of the vehicle put Officer Davenport in the position of not knowing what he may be facing. The Fourth Circuit has noted that the potential harm to officers increases exponentially when the interiors of vehicles are blocked from view by tinted windows. *United States v. Stanfield*, 109 F.3d 976, 981 (4th Cir. 1997). Given the unusual and suspicious circumstances in this case, the court concludes that Officer Davenport acted reasonably in asking Defendant to lower the back passenger window. Davenport legally viewed the handgun in the vehicle when the window was rolled down. He was under no obligation to ignore evidence that his safety may be in danger or that a crime was being committed.

Once Officer Davenport saw the handgun in plain view, he also had reason to be concerned with whether there was a weapon on Defendant's person or within reach in the vehicle. "Where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience . . . that the persons with whom he is dealing may be armed and presently dangerous . . . he is entitled for the protection of himself . . . to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which may be used to assault him." *Terry v. Ohio*, 392 U.S. 1, 301-31 (1968). Moreover, "[a] search of the passenger compartment of an automobile, limited to those areas in which a weapon may be

placed or hidden, is permissible if the police officer possesses a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officers in believing that the suspect is dangerous and the suspect may gain control of weapons." *Michigan v. Long*, 463 U.S. 1032, 1034-35 (1983). A protective sweep was proper in this case.

Moreover, once Officer Davenport saw a concealed weapon he had probable cause to search the vehicle for other concealed weapons. Under the automobile exception to the search warrant requirement, an officer who has probable cause to believe that a motor vehicle contains criminal evidence may search that vehicle for the evidence. *United States v. Ross*, 456 U.S. 798, 825 (1982).

Given the circumstances of this case, Davenport was justified in doing a search of Defendant's person and the passenger compartment of his vehicle. Accordingly, there is no basis for suppressing any of the evidence seized from the passenger compartment.

Defendant further argues that Davenport subjected him to an illegal arrest in violation of his constitutional rights because Davenport had seen nothing illegal occur other than the failure to signal when making a left turn and a firearm in the vehicle. Probable cause to arrest a suspect exists when a police officer has knowledge of reasonably trustworthy facts and circumstances to cause a reasonable person to believe that a crime is being, has been, or is about to be committed by a suspect. Based on the safety concerns present, Davenport was justified in placing Defendant in custody and patting him down for additional weapons once he viewed the weapon in the vehicle. Assuming that Defendant was arrested when he was initially placed into handcuffs,

Davenport could have arrested Defendant for the traffic violation. The Fourth Amendment does not forbid an arrest for a minor criminal offense punishable only by a fine." *Atwater v. City of Lago Vista*, 532 U.S. 318, 323 (2001). While it is unusual for an officer to arrest a driver for an offense as minor as a signal violation, Defendant's actions in leading the officer away from the public streets caused such a safety concern that it was not completely out of the question in this case.

Davenport was also justified in detaining Defendant until he could run a check on the whether Defendant was a concealed weapons holder. A concealed firearm permit holder in Utah is required to immediately advise a police officer that he or she is a permit holder and in possession of his or her firearm. Utah Administrative Code R72-300-12. Defendant did not so notify Davenport, and Davenport testified that, in his experience, the vast majority of permit holders comply with this requirement. Davenport had probable cause to believe that Defendant possessed the gun unlawfully. Accordingly, the court concludes that Defendant's arrest did not violate his constitutional rights.

## CONCLUSION

Based on the foregoing, Defendant's Motion to Suppress Evidence is DENIED.

DATED this 19th day of February, 2008.

BY THE COURT:

*Dale A. Kimball*
DALE A. KIMBALL
United States District Judge